Filed 4/25/13  Trivedi Foundation v. Morrisette CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| TRIVEDI FOUNDATION, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MICHELE MORRISETTE, <br><br> Defendant and Appellant. | B241096 <br><br> (Los Angeles County <br> Super. Ct. No. BC473236) |

APPEAL from an order of the Superior Court of Los Angeles County. Mel Red Recana, Judge.  Reversed.

Magnanimo & Dean and Lauren A. Dean for Defendant and Appellant.

Kronenberger Rosenfeld, Karl S. Kronenberger and Jeffrey M. Rosenfeld for Plaintiff and Respondent.

_____

## INTRODUCTION

This is an appeal from an order denying a special motion to strike pursuant to Code of Civil Procedure section 425.16. Because the defendant demonstrated that the plaintiff's claims arise from "protected activity" within the meaning of this statute but the plaintiff failed to meet its burden to establish the probability of prevailing on its claims, we reverse.

## FACTUAL AND PROCEDURAL SUMMARY

*The Complaint*

In November 2011, Trivedi Foundation, Inc. (Foundation) filed a complaint for breach of contract and injunctive relief against Michele Morrisette. According to the complaint, Trivedi Foundation, a non-profit organization established by Mahendra Trivedi in 2009, works with the scientific community at major universities and research centers to document the "transformational properties of Trivedi's energy transmissions, which impact living organisms and inanimate objects for better performance." Morrisette was a former independent contractor who had provided services to the Foundation in the summer of 2010 but terminated her contract by notice dated July 6, 2010. Morissette then raised claims against the Foundation, and the parties entered into a written Confidential Agreement and Release dated August 28, 2010.

The Agreement (which was not attached as an exhibit to the complaint) includes a "No Interference or Disparagement" provision which states: "All parties agree that they will take no action from this date forward that might interfere with the other's activities or damage their reputation. Prohibited actions would include, but not be limited to, private or public comments, statements, or writings critical of [the Trivedi Foundation], or complaints filed against [the Trivedi Foundation] with any regulatory agency." The Agreement also required the Trivedi Foundation to make a payment to Morissette, and the Foundation made payment to her as required.

2

According to the Foundation's complaint, Morrisette had breached the Agreement by sending two emails dated August 25, 2011 to current and former employees and associates of the Foundation, accusing Trivedi and the Foundation of unlawful conduct and insinuating the government would soon shut down the company. In addition, on information and belief, the Foundation alleged Morrisette, under the pseudonym "PurQi", had established and maintained a website, www.purqi.com, containing comments, statements and writings critical of the Foundation. The Foundation believes Morrisette uses the pseudonym "PurQi" because she posted a picture of herself on July 7, 2011, and she signed posts on August 18 and September 2, 2011, "Michele." In seven separate "PurQi" posts in June, July and August 2011, Morrisette questioned the legitimacy of the Foundation's business practices and accused Trivedi and the Foundation of unlawful actions.

According to the complaint, Morrisette's writings have caused the Foundation's affiliates to withdraw their public support and to cancel conferences at which sales would be made, have caused discord among Foundation staff, corporate sponsors, supporters, affiliates and associates and have damaged its reputation in an amount exceeding $1 million.

*The Special Motion to Strike*

In response, Morrisette filed a special motion to strike Trivedi's complaint as a "Strategic Lawsuit Against Public Participation (SLAPP suit)" pursuant to Code of Civil Procedure section 425.16.[1] (All undesignated statutory references are to the Code of Civil Procedure unless otherwise indicated.) Morrisette argued the PurQi website and the

---

[1] Morissette also filed a cross-complaint against the Foundation as well as Trivedi and Trivedi Master Wellness, LLC, asserting the following causes of action: (1) fraud and deceit, (2) wrongful termination/adverse treatment in violation of statute and public policy, (3) intentional infliction of emotional distress, (4) assault, (5) failure to pay statutorily mandated wages, (6) failure to maintain records and provide accurate itemized wage statements, (7) rescission of unlawful/fraudulent agreement and (8) unlawful, unfair and fraudulent business practices.

3

statements precipitating the complaint were matters of public interest within the meaning of subdivisions (e)(3) and (e)(4) of the statute, and it was not probable the Foundation would prevail on its claims as her declaration established she had been an employee—not an independent contractor—so the entire agreement and the nondisparagement provision in particular were illegal and therefore void and, in any event, the agreement was procured by duress.

According to Morrisette's declaration, she first learned of Trivedi when he was profiled at Deepak Chopra's 2010 Sages and Scientists convention which she attended. Trivedi was presented as a "unique individual with miraculous abilities that had been scientifically validated." She learned Trivedi "performed 'thought transmissions,' also called 'blessings,' and that he and the Foundation's then President (Debra Poneman) reported to the audience (approximately 250-300 people) a variety of miraculous healing instances, including but not limited to, individuals being pronounced cancer free after a blessing. Additionally, they publicly stated that Mr. Trivedi was able [to] restore health and vitality to individuals." A PowerPoint presentation was shown demonstrating Trivedi's "'scientifically validated results' with cattle, agriculture crops and, I believe, non-living matter including but not limited to water and ceramics."

During 2010, according to Morrisette's declaration, Trivedi maintained a website at trivedifoundation.org where he represented it was the Foundation's and Trivedi's mission to research the benefits of Trivedi's "thought transmission[s]." According to representations on the Foundation's website, Morrisette was informed Trivedi's "thought transmission" had been validated in more than 4,000 scientific studies and Trivedi's abilities had been validated specifically by Pennsylvania State University. In fact, Trivedi "proudly told stories about seeking out premier research facilities in the United States and that of just a few considered, he and his staff chose Pennsylvania State." For much of 2010, Trivedi used the alleged endorsements of Penn State and Deepak Chopra--posted on his website—as a way of drawing in individuals. The Foundation also "stated

4

and published its primary objective on its website: 'to improve the quality of life and well-being for people on [E]arth. This will be accomplished in part by Trivedi's proven ability to create abundant, disease-free and highly nutritious crops, uncontaminated and pure water, and a clean and unpolluted environment.'" Morrisette said Trivedi had "several websites where he promotes his services and product lines, including a YouTube channel and community forums on Facebook pages."

In her declaration, Morrisette said she met Trivedi in person during one of his "'blessings' retreats" in Sedona, Arizona, on April 10 and 11, 2010. Following one of the "'blessings sessions,'" Trivedi asked to meet with Morrisette personally and invited her to dinner with him and his personal assistant. Then, the following morning, she was invited back to the home where the blessings had taken place. At that time, Trivedi spoke with Morrisette about working with his company which he said was at an "exciting growth stage." Trivedi said those who chose to work with him during this early stage would be part of his "'inner circle.'" He called Morrisette and another woman "'rough diamonds'" that would become "diamonds" as his "'inner circle' prospered." He promised those who joined then (Spring 2010) "an equity interest" in his company. He said an LLC would soon be formed and promised Morrisette her "hard work would be substantially rewarded."

Throughout further pre-offer conversations with Trivedi, Morrisette said, Trivedi and his newly hired Director of Operations (Janice Burney) explained that "initially" Morrisette (and others) would be "brought on as 'independent contractors,'" but as soon as a Human Resources system was in place, Trivedi promised Morrisette she would be "converted to [an] employee[]." He said her initial salary would be lower than what she was currently making but said he would reward her willingness to take a lower salary and "promised [her] an equity stake in the company and a higher salary as the LLC grew." She was earning $8,750 in her current position at the time but told Trivedi the bare minimum she needed to survive was $5,000 per month. He said his highest paid

5

employee (Burney) was making that amount and asked if she would accept less if he provided housing. He said the Foundation planned to rent a house for use as an office and to provide extra bedrooms for the rare occasions when out-of-town Foundation members or employees would stay there. In light of anticipated pay of even less than $4,500 ("potentially $3,000 during an interim phase"), Trivedi told Morrisette she and her daughter could live there.

On April 14, 2010, Trivedi offered Morrisette a position with the Foundation at $4,500 per month, indicating he had "consulted his 'divine' and received approval" for doing so. He offered her the position of "'Director of Foundation Relations,'" and Morrisette understood she would be responsible for building relationships with individuals targeted as potential investors or business partners for the Foundation. In particular, Trivedi gave her details on his strategy to target influential individuals who would support his mission. He told her words to the effect: "[I]f I can persuade 10 celebrities or people of influence to testify to my abilities, it is much less wearing on me and the message of my gift and abilities will be available to the public much sooner versus the time it would take to bless thousands of average individuals." Trivedi repeated his promise to Morrisette that she would return to her higher rate of pay "in a couple of months" and "in the near future," she would have "a living space and benefits to make up for [her] lower wage."

After being hired as Director of Foundation Relations but before her official start date, Morrisette said, she was assigned to find a residence for the Foundation to rent in the Los Angeles area. In the evenings, she researched and visited potential rentals in Los Angeles, Santa Monica and Beverly Hills. Every property she suggested was rejected and she was not compensated for her time. On May 2, she officially began working for the Foundation but contrary to Trivedi's representations, the majority of her duties were menial tasks, such as acting as chauffeur to Trivedi and others, performing administrative and clerical tasks and acting as Trivedi's personal assistant—bringing him water, coffee

6

and food.  In the performance of these "nonexempt" duties, Trivedi required Morrisette to work "extraordinarily long hours, seven days a week, and to be available to [him] 24 hours per day."  She and other employees were told they were "like a family who were working to grow our business together," and they were expected to work seven days a week.  In a special conference call, Trivedi told the employees it "offended" him when they claimed gas or mileage when they drove to see him, and they would not be reimbursed.  The management threatened that salary would be docked if a full seven-day week was not worked and anything less was unacceptable.  Another employee's salary was docked for failure to work on a Saturday.  Because of these threats, Morrisette slept with her computer and cell phone on her bed in case a call came after midnight or before 6:00 a.m. so she could meet Trivedi's demands without being criticized.

According to Morrisette's declaration, Trivedi created a hostile and abusive working environment and subjected Morrisette to discriminatory treatment on the basis of her gender and national origin.  On multiple occasions, unlike his treatment of her "male and/or Hindu counterparts," Trivedi called her an "idiot" and "stupid" and publicly criticized her during staff calls.  When he was in the same room following such an incident, he would then pat her head as if "trying to pacify a dog for having abused it."  She was also offended by Trivedi's repeated abuse of other women within the Foundation.

Between May 8 and 10, Morrisette said, she was directed to drive Trivedi around Los Angeles to homes in the area.  On one of these evenings, Trivedi started "screaming at and berating [Morrisette]," "raising his hand in a threatening manner as if he was going to hit [her]."  In an "irate rage," Trivedi objected to innocuous conversation with Kathy Hilton of Hilton Hotels, Lauren King of King World Entertainment and celebrity journalist Cheryl Woodcock about weight gain as a potential side effect of Trivedi's "'blessings.'"  Trivedi "yelled, 'If I lose these clients, are you going to get me new clients of this caliber?  This is not about you, it's about me!'"  With Morrisette captive in his car,

7

Trivedi continuously screamed at her for 20 to 30 minutes. She was terrified and wept. The next day, she complained to Burney that Trivedi had verbally abused her the prior evening. Burney threatened to fire her. Morrisette could not comprehend what was happening as it was so dramatically different from her experience leading to her acceptance of her position with the Foundation.

According to Morrisette, not only was she abused, but so was her daughter. Morrisette was told her daughter could volunteer during the first Los Angeles "blessing days" on May 11 and 12 to receive service credit for her high school. At that time, Trivedi verbally abused Morrisette's daughter, yelling that she "had ADHD" and was an "idiot, stupid!" Contrary to the duties of the job she was promised, Morrisette was again directed to perform menial duties instead, chauffeuring Trivedi and helping blessings recipients complete forms. When she and a coworker attempted to take a meal break, Trivedi "aggressively approached" and said they were "'not being productive.'" They ate sandwiches while working.

On May 13, Morrisette said, after a visit to a winery (Lambert Bridge) which Trivedi said was owned in part by philanthropist Ray Chamber, Trivedi directed her to drive him and others from Los Altos back to Dana Point. She had started work that day at 6:30 a.m. She drove until 2:00 a.m. on May 14 when she was too exhausted to drive any longer. She told Trivedi she could not drive anymore and needed a break. He yelled at her in front of the others, saying, "You are being selfish. The others need rest. These people worked harder than you." When she tried to pull over for the safety of herself and the others in the car, he again raised his hand as if he was going to hit her. Then he opened his window as if that would keep her awake. She told Trivedi her friend had died in a car accident because he left work extremely late and tried to drive home while too tired, but he refused to listen to anything she said. She did not want to be responsible for harm to anyone but her pleas went unheeded she said. Terrified of Trivedi, she continued to drive until about 4:00 a.m. On the verge of falling asleep at the wheel, she finally

8

pulled into a gas station, requesting that someone else drive as she could not guarantee staying on the road.

According to Morrisette's declaration, on May 18, the Foundation unilaterally changed her job title to Events Manager which also consisted of a majority of nonexempt job duties. Even though "Human Resources was being instituted" by Burney, the Foundation failed to convert Morrisette to an employee as promised. The Foundation's treatment was contrary to its treatment of male and/or Hindu employees. For example, the wife of one Hindu-speaking employee said he was paid $8,000 per month "under the table." Further, as a "supposed exempt employee," Morrisette was required to document the work she performed every 30 minutes throughout the day.

By the end of June, it was clear to Morrisette that Trivedi had lured her to the Foundation with false promises that were not going to come to fruition. After realizing her employment was "procured through fraud" and that the Foundation "never intended to have [her] perform in the position for which [she was] hired" and "after enduring intolerable working conditions in the form of constant illegal abuse and harassment" from Trivedi, she said, she was "completely broken" and could not take the abuse any longer. She told the Foundation at the time: "My heart has been broken for over a month and the tears that I have cried for what is happening . . . are too many to count." On July 6, she said, the Foundation wrongfully constructively terminated her employment.

In her declaration, Morrisette said she felt "extraordinary shame" that she had "fallen for what I now believe to be false representations regarding Trivedi's mission and abilities." She felt Trivedi was a "sham" and representations on his website were false. She said she was so sickened by him and believed his representations about his "'blessings'" to be false that she sought a refund from him for the $850 she had paid for such "'blessings'" in March and April. The Foundation agreed to refund this amount but required her to sign a release in order to receive it. She was "desperate and emotionally distraught." Because she had taken a significant pay cut and had been falsely promised a

9

housing benefit, she had no savings left and no income.  She could not meet her rent.  She signed the release in order to avoid eviction.  She attached the two-page "Confidential Agreement and Release" as an exhibit.

The Agreement between the Foundation and Morrisette specified that the Foundation would pay out "a final amount of $850 for a blessing refund" and Morrisette acknowledged "she is owed no additional compensation of any kind."  She agreed not to file any claims or charges against the Foundation in the future.  The Agreement provided for confidentiality except that Morrisette could disclose the Agreement's terms to her immediate family, attorney, accountant or similar advisor (and she would direct such individuals to maintain the confidentiality of the Agreement).

Paragraph 8 of the Agreement bore the heading "No Interference or Disparagement."  It was worded as follows:  "All parties agree that they will take no action from this date forward that might interfere with the other's activities or damage their reputation.  Prohibited actions would include, but not be limited to, private or public comments, statements, or writings critical of [the Foundation], or complaints filed against [the Foundation] with any regulatory agency.  Nothing contained herein shall prevent [Morrisette] from responding truthfully to inquiries [from] any government agency pursuant to any subpoena or other compelled form of inquiry."

The Agreement further specified that the law of Iowa would govern the Agreement and its construction and enforcement; provided for severability in the event any portion was found to be invalid; recited that the Agreement represented the parties' complete understanding "in connection with its subject matter," superseding any prior oral or written agreements or understandings; indicated Morrisette would have to repay the "blessing refund money" if she violated any term including but not limited to the confidentiality clause; and stated time was of the essence.[2]

_____

[2]    The Agreement was signed and dated by Morrisette on August 25, 2010 (with a signature and date on behalf of the Foundation on August 28, 2010).

10

Morrisette's counsel (Lauren Dean) also submitted a declaration and supporting exhibits, including a copy of the PurQi.com home page (Exhibit 3) and posts to the PurQi website at https://purqi.wordpress.com/2011/07/05/the-power-of-freedom-free-will and http://purqi.wordpress.com/2011/08/27/where-is-the-truth-in-advertising (Exhibits 4 and 5) as well as posts from the Foundation's website, including information on the Founder (Trivedi) and a Message from the President (Trivedi). In addition to representing Morrisette, Dean said, she represented at least five others "pursuing" the Foundation and related entities, and a complaint she had filed on behalf of three of these women was attached as Exhibit 2 to her declaration.

The Foundation filed opposition, arguing the Confidential Agreement and Release was valid and enforceable, and Morrisette had breached it by making disparaging statements about Trivedi "for which no free speech protection is afforded." In addition, the Foundation argued Morrisette had made false and defamatory statements on two websites created for this purpose; she could not establish her statements were within the meaning of section 425.16, and even if she could, the Foundation only had to show "minimal merit" to its claims.[3]

Morrisette filed a reply, arguing the Foundation had effectively conceded that Morrisette satisfied the first prong of the section 425.16 analysis and had no probability of prevailing on the merits. Citing *Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 609, she argued and filed separate evidentiary objections to Trivedi's declaration and exhibits other than the Agreement she had attached to her own declaration. Morrisette further contended that Trivedi's declaration was invalid and could not be considered for failure to comply with the mandatory requirements of section 2015.5. Morrisette also filed a request for judicial notice of a complaint (for defamation,

---

[3]     Trivedi said some of the posts on the PurQi website were attributed to "Michele" and said he had seen a picture of Morrisette on the PurQi website but the picture had been removed.

tortious interference with business relations and injunctive relief) the Foundation had filed against Tania M. Slewicki in federal court.

*The Hearing*

After reviewing the trial court's tentative ruling (which is not included in the record), Morrisette's counsel argued there was no probability the Foundation would prevail as there was no evidence of a breach, liability or damages; the Foundation's evidence was inadmissible and the complaint would not suffice.[4] "There's no evidence at all that [Morrisette] made those statements on this public [Web s]ite." She argued even if the Foundation were permitted to file its amended declaration, the statements on the Web site attributed to Morrisette had not been authenticated so there was absolutely no evidence of any breach.

Counsel for the Foundation responded that, even if the trial court rejected the Foundation's evidence, sufficient evidence was provided by Morrisette though the declaration of her counsel (Lauren Dean) and Exhibit 3 to Dean's declaration, a copy of the home page of the PurQi Web site, which referred to "The Trivedi Foundation" and directed viewers where to obtain further information, as well as Exhibit 5, where Morrisette discussed "our favorite guru," meaning Trivedi, "since this is the page that's linked [to the] Trivedi Foundation. She then goes on to the next page to discuss . . . this cowardly, self-preservation desire for money, reputation, chosen over doing the right thing. [¶] This does come back to haunt a person. . . . [E]ven without our declaration or any evidence that we submitted, it's clear that her client did breach the non-disparaging clause by discussing . . . my client online."

---

[4]     On the day of the hearing, the Foundation attempted to file an amended declaration to cure the Code of Civil Procedure section 2015.5 defects in Trivedi's declaration and to make specific reference to the other Exhibits within Trivedi's declaration. Morrisette further objected to this attempted filing as well, but it appears the trial court did not consider it.

Dean said, "My declaration addresses what is currently on the PurQi Web site. It does not link the comments that are on the PurQi Web site to Michele Morrisette at all. There's absolutely no evidence that Michele Morrisette made those comments on that Web site, none. [¶] It's—the Web site is a blog where other people post comments, other individuals. There's absolutely no evidence as to who is running that blog or who is running that Web site." Later, she reiterated, "In any event, there's no evidence of breach or liability. My declaration absolutely does not link Ms. Morrisette to the comments on—it only provides the court with information about what's on the PurQi Website, what people are saying, and that is an issue of public concern. That was the sole purpose of my declaration. It has no evidence whatsoever linking the defendant in this case to that Web site, and there's no evidence whatsoever."

The trial court took the matter under submission.

*The Trial Court's Ruling*

The trial court sustained all of Morrisette's evidentiary objections, but denied her special motion to strike. The court observed the complaint itself contained allegations the Trivedi Foundation works with the scientific community at major universities and research centers around the world such that statements attributed to Morrisette on a public internet website involve a topic of widespread public interest. However, the trial court rejected Morrisette's claim she had proven her affirmative defenses as a matter of law and found Morrisette's own evidence (Exhibits 4 and 5) and the written agreement were sufficient evidence the Trivedi Foundation had a probability of prevailing.

Morrisette appeals.

## DISCUSSION

In ruling on a defendant's special motion to strike under section 425.16, the trial court engages in a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts

13

of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. Under section 425.16, subdivision (b)(2), the trial court in making these determinations considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'" (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) We review the trial court's rulings on a SLAPP motion independently under a de novo standard of review. (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 929.)

For purposes of the anti-SLAPP statute, an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (*Holbrook v. City of Santa Monica* (2006) 144 Cal.App.4th 1242, 1246-1247, quoting § 425.16, subd. (e).)

"[I]t is the principal thrust or gravamen of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies." (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188 (*Martinez*).) In its complaint, on information and belief, the Foundation alleged Morrisette, under the pseudonym "PurQi", had established

14

and maintained a website, www.purqi.com, containing comments, statements and writings critical of the Foundation, questioning the legitimacy of the Foundation's business practices and accusing Trivedi and the Foundation of unlawful actions. According to Morrisette, "There can be no dispute that the PurQi website and blog appearing on the PurQi website are covered by section 425.16[, subdivisions] (b)(1), (e)(3) and (4) of the anti-SLAPP statute." Subdivision (e)(3) defines a protected act in furtherance of the right of petition or free speech in connection with a public issue as "any written or oral statement or writing made in a place open to the public or in a public forum in connection with an issue of public interest." Internet venues constitute a "public forum" or a place "open to the public" within the meaning of section 425.16. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4; *Kronmeyer v. Internet Movie Data Base, Inc.* (2007) 150 Cal.App.4th 941, 950; *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1367.) Moreover, "public interest" for purposes of section 425.16 is "broadly construed," need not be "significant" and includes any issue in which the public takes an interest. (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479; *Nygard v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1039.) Accordingly, particularly in light of the Foundation's allegations in its own complaint as well as similar representations on its own website boasting of the public's interest in Trivedi's "blessings" (including claims of healing and cure), we agree that the first prong of section 425.16, subdivision (b)(1) was satisfied. (See *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23-24 [website critical of plastic surgeon]; *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898; *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 566-567.)

Where as here the defendant (Morrisette) has made a prima facie showing to invoke the protection of section 425.16, the burden shifts to the plaintiff (the Foundation) to establish a probability it will prevail on its claims. (§ 425.16, subd. (b).) Gaps in a plaintiff's showing of a "probability of success on the merits" may be filled by a defendant's evidence. (*Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1289.) Proof of a

15

"legal defense to liability . . . is *immaterial* to the first prong of the anti-SLAPP analysis—i.e., determining whether plaintiff's claim is based on defendant's protected activities.[5]  But if [section] 425.16 is shown to apply, proof of a valid defense is relevant to the second prong of the analysis—i.e., determining *whether there is a probability of plaintiff prevailing* in the action."  (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) [¶] 7:938 at p. 7(II)-44, citing *Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 445.)

According to Morrisette, the Foundation did not establish a probability of prevailing on its breach of contract cause of action because the trial court correctly concluded all of the Foundation's evidence was inadmissible, but incorrectly determined Morrisette's own evidence sufficed.  We agree with Morrisette.

Citing our decision in *Fashion 21 v. Coalition for Humane Immigrant Rights of Los Angeles* (2004) 117 Cal.App.4th 1138 (*Fashion 21*), the Foundation says the trial court erred in refusing to consider Trivedi's declaration and the Foundation's exhibits. We disagree.

"It is well settled that in opposing a SLAPP motion the plaintiff's showing of a probability of prevailing on its claim must be based on admissible evidence."  (*Fashion 21, supra,* 117 Cal.App.4th at p. 1147; *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1236 [the showing must be made through "competent and admissible evidence"].)  Trial court rulings on the admissibility of evidence are generally reviewed for abuse of discretion.  (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317, citations omitted; *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476.)

Here, Trivedi filed a declaration stating he was a "duly authorized representative" of the Foundation and was "authorized" to make the declaration.  He said he had read the

---

5      "SLAPP is an acronym for 'strategic lawsuit against public participation.'" (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57, fn. 1.)

"Plaintiff's Response to Defendant's Motion to Strike," and "the matters and things therein stated are true and correct to the best of my knowledge and belief." Regarding the PurQi website referenced in his complaint, he said: "Defendant continues to post false and defamatory statements on the Pur[Q]i [Web s]ite (as defined in the Plaintiff's Response) and other forums, as well as solicit and encourage others to do the same. [¶] The Pur[Q]i [Web s]ite remains operational, and, since this lawsuit has commenced, on at least six separate occasions, Defendant has encouraged others to post disparaging content on the Pur[Q]i [Web s]ite. [¶] The founder of the Pur[Q]i [Web s]ite uses the screen name "PurQi" and posted her picture on the PurQi [Web s]ite at one point. Although the picture has been removed, I saw the picture and identified the person as the Defendant." He concluded, "All of the foregoing matters are within my personal knowledge."

Trivedi's declaration was submitted as "Exhibit B" to the Foundation's "Response" to Morrisette's special motion to strike. "Exhibit A" was comprised of 14 pages—some (but not all) of which made reference to "PurQi" and/or Trivedi. The first page in this stack reads: "The Power of: Sanctuary[;] Posted on 7 July 11 by PurQi 6 comments[;] Today you get a big reveal in that I'm posting my picture. No darts please!! Now you can see who you are corresponding with since many of us haven't meet [sic] in person. I like to know what the person I'm talking to looks like and thought you might too." A rectangular box appears after this text, with the following words (in a smaller and different font) inside: "Michele's picture was here."

Another page with the same text and box is presented as "Exhibit C." However, the version attached as "Exhibit C" is noticeably different from the page included with "Exhibit A." This second version includes a line of four asterisks ("*      *      *      *") after the words "6 comments," and includes the following additional text (followed by another line of four asterisks): "The picture was taken about a month before I started working at the Trivedi Foundation. I was happy, things were going well. Today I look at it and can say; 'I'm back!' Happiness is returning and for awhile I wasn't sure it would."

17

Additional pages include unattributed text such as the following: "Apparently people are not real happy that fraudulent scientific data was used to persuade them to make purchases. Who would have thought?!" and "Our question is[:] 'Is this what the highly touted and trademarked Trivedi Effect really is? A terrible virus that has been unleashed on the general population?'" Someone identified as "iris" purportedly stated: "Trivedi is a FRAUD MAN." Someone else identified as "Dennis Lang" made comments such as: "This is no longer the story of a fake guru with fake science who uses his self-proclaimed grandiosity to rape young women[; and] We do know that in laboratory testing Mr. Trivedi hasn't demonstrated anything." "Robert" said: "People are foolish to attribute their upswings to one idiot like this man. [¶] I give no credence to the fools who say their lives were changed by this con artist. The sooner he is arrested, it is better for the society. [¶] [I] am sure that [K]en [W]ilbur gets a cut out of this scumbag's revenues. So he jumps up and endorses this idiot. [L]ook at the team he has—there's a bunch of corrupted money[-]hungry[,] rich sob's [sic] capitalizing and feeding this racketeer. Deepak [C]hopra has backed out of his endorsements fearing his reputation and also realizing he could be in for a disastrous consequence if he supports this fraud."

Morrisette filed evidentiary objections to all of Trivedi's Declaration ("Exhibit B") as well as Exhibit A and Exhibit C, and the trial court sustained all of these objections.

Citing *Kulshrestha v. First Union Commercial Corp.,supra,* 33 Cal.4th at page 609, Morrisette said Trivedi's entire declaration was invalid and could not be considered for failure to comply with the requirements of Code of Civil Procedure section 2015.5, including the requirement to certify or declare under penalty of perjury under the laws of the State of California that the statements contained in the declaration are true and correct. In addition, with respect to the assertions in Trivedi's declaration that "the founder of the PurQi Web site uses the screen name 'PurQi' and posted her picture on the PurQi [Web s]ite at one point" and it was Morrisette ("[a]lthough the picture has been

removed") and that Morrisette posted and solicited others to post defamatory statements on the PurQi Web site, Morrisette objected that the statements lacked foundation and constituted inadmissible conclusions, opinions and hearsay. (*Gilbert v. Sykes, supra,* 147 Cal.App.4th at p. 26 ["declarations that lack foundation or personal knowledge, or that are argumentative, speculative, impermissible opinion, hearsay, or conclusory are to be disregarded"].)

Moreover, Morrisette successfully argued, the Foundation's Exhibits A and C (the purportedly false statements attributed to Morrisette on the PurQi Web site) were inadmissible for lack of foundation. (Evid. Code, §§ 1400 ["Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law"] & 1401, subds. (a) & (b) ["Authentication of a writing is required before it may be received in evidence[, and a]uthentication of a writing is required before secondary evidence of its content may be received in evidence"].)

According to the Foundation, the trial court erred in refusing to consider Trivedi's declaration and the Foundation's exhibits under our decision in *Fashion 21, supra,* 117 Cal.App.4th 1138, in which we determined the trial court did not commit reversible error when it considered an edited videotape in determining Fashion 21's probability of prevailing on its defamation claim for purposes of a section 425.16 special motion to strike. (*Id.* at p. 1146.) In opposing the special motion to strike, Fashion 21 (the plaintiff) relied on an edited videotape of a demonstration videotaped by one of its own employees. (*Id.* at p. 1145.) The Coalition for Humane Rights (the defendant) objected that Fashion 21 had failed to submit evidence the editing did not alter the appearance of the activities shown on the original unedited version as required by Evidence Code section 1402. (*Id.* at pp. 1145-1146.) The trial court *overruled* the objection and

19

considered the edited tape in concluding Fashion 21 had established a reasonable probability of prevailing on its claim. (*Id.* at p. 1146.)

The Foundation's reliance on *Fashion 21* is misplaced. First, the Foundation ignores the standard of review. As we said in *Paanu v. Land Rover North America, Inc., supra,* 191 Cal.App.4th at p. 1317, "An appellate court's ruling that a trial court did not abuse its discretion in admitting a certain type of evidence is not authority for the proposition that it is an abuse of discretion to exclude similar evidence in another case." The trial court in *Fashion 21* overruled the evidentiary objections and exercised its broad discretion to admit the edited videotape, but it does not follow that the trial court in this case erred in excluding the evidence submitted by the Foundation. The issue before us is not whether the trial court *could have* considered the Foundation's evidence as presented, but rather whether the trial court abused its discretion in sustaining Morrisette's objections to that evidence and excluding it from the court's consideration as a result.

Moreover, the evidence excluded in this case bears no resemblance to the evidence admitted in *Fashion 21*. As we noted in *Fashion 21,* had the plaintiff offered the edited videotape at trial*,* the defendant's objection would have been well taken as Evidence Code section 1402 requires the party offering an edited videotape to bear the burden of showing the editing did not distort the "meaning" of the activity depicted in the tape. (117 Cal.App.4th at pp. 1146-1147.) Nevertheless, because "it would be a simple matter to have the videographer truthfully testify at trial he shot the original videotape, the tape was edited to conserve the court's time and delete the portions not relevant to this case, he compared the edited version of the tape to the original and the edited version accurately depicts the conduct on the original" in order to satisfy Evidence Code section 1402, we concluded in *Fashion 21* that *admitting* the edited videotape was not a sufficient ground for *reversing* the trial court's order denying the SLAPP motion. (*Id.* at p. 1148.)

20

By contrast, in this case, not only did Morrisette object that Trivedi's declaration did not comport with Code of Civil Procedure section 2015.5, but she also raised other objections, including the failure to state facts showing personal knowledge sufficient to support the conclusions Trivedi asserted regarding Morrisette. (*Gilbert v. Sykes, supra,* 147 Cal.App.4th at p. 26 ["declarations that lack foundation or personal knowledge, or that are argumentative, speculative, impermissible opinion, hearsay, or conclusory are to be disregarded"].) The Foundation has shown no abuse of discretion in this regard. Moreover, Morrisette successfully objected that the Foundation's other exhibits (the documents alleged to have come from the PurQi Web site) were inadmissible for lack of authentication. Indeed, Trivedi's declaration made no reference to Exhibits A and C. In addition, unlike the videotape at issue in *Fashion 21* which could "simply" be authenticated by testimony from the videographer (the proponent's own employee) who shot the original videotape stating he had not changed its meaning through editing (117 Cal.App.4th at pp. 1145, 1148), the Foundation provided no basis whatsoever for concluding the documents were what the Foundation contended they were as required under Evidence Code sections 1400 and 1401.

"'[A]nyone can put anything on the Internet,'" and "'hackers can adulterate the content on *any* web-site from *any* location at *any* time.'" (*People v. Beckley* (2010) 185 Cal.App.4th 509, 515-516, quoting *St. Clair v. Johnny's Oyster & Shrimp, Inc.* (S.D.Tex. 1999) 76 F.Supp.2d 773, 774-775 [ownership of boat could not be established through information available on U.S. Coast Guard's online vessel database]; and see Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2011) ¶ 8:359 at p. 8C-30, citations omitted.) Internet-based information is often viewed as "inherently untrustworthy" with the Internet regarded as a "catalyst for rumor, innuendo, and misinformation." (*Ibid.*, citations omitted.)

The Foundation failed to provide any basis for authenticating the documents purportedly obtained from the Internet—the PurQi Web site in particular. (Wegner et al.,

21

Cal. Practice Guide: Civil Trials and Evidence, *supra*, at ¶¶ 8:359.1 through 8:359.5 at pp. 8C-30 to 8C-31, citations omitted [factors which may provide a basis for authenticating Internet-based material as evidence include distinctive characteristics such as unique hypertext markup codes, the context in which the proponent obtained the documents, the content itself, and testimony from the person who created the Internet-based documents].) Here, the Foundation presented no evidence to establish the documents were what the Foundation claimed them to be. To the contrary, Exhibit A and Exhibit C contained materially different versions of what was purportedly the same entry on the PurQi Web site—with no explanation for the disparity provided. Moreover, none of the pages included in Exhibits A and C bore information regarding the Web addresses or dates of printing (or any headers or footers at all), let alone a declaration of the person printing the documents sufficient to support a finding of authenticity. The trial court did not abuse its discretion in excluding all of the Foundation's evidence.

In its ruling, the trial court also concluded Morrisette's *own* evidence constituted sufficient admissible evidence to demonstrate the probability the Foundation would prevail on its claim Morrisette had breached her agreement with the Foundation.[6] In this respect, we disagree.

As Morrisette notes, "A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff. [Citation.]"[7] (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990)

---

[6]    As set forth in the factual and procedural summary, the trial court (apparently inadvertently) identified Exhibits 4 and 5 in its order, but Exhibits *3* and 5 were the exhibits to Dean's declaration addressed at the trial court hearing.

[7]    The Foundation also purportedly asserts a second cause of action for injunctive relief, but injunctive relief is an equitable remedy and not a cause of action. (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1360, fn. 2.) Because section 425.16 applies only to a "cause of action," we focus our analysis on the breach of contract claim. (*Ibid.*)

222 Cal.App.3d 1371, 1388.) Morrisette attached a copy of the "Confidential Agreement and Release" to her own declaration and acknowledged she had signed it. According to the terms of the Agreement, Morrisette further acknowledged "that she has been paid" the "final amount of $850 for a blessing refund," and "that she is owed no additional compensation of any kind."

With respect to the element of breach, as provided in paragraph 8 of the "Confidential Agreement and Release" (Exhibit 1 to Morrisette's declaration), "All parties [identified as the Foundation and Morrisette] agree that they will take no action from this date forward that might interfere with the other's activities or damage their reputation. Prohibited actions would include, but not be limited to, private or public comments, statements, or writings critical of [the Foundation], or complaints filed against [the Foundation] with any regulatory agency. Nothing contained herein shall prevent [Morrisette] from responding truthfully to inquiries [from, sic] any government agency pursuant to any subpoena or other compelled form of inquiry."

Morrisette supported her special motion to strike with evidence including the declaration of her attorney (Dean) who testified she had visited the PurQi.com Web site, and attached a copy of its home page as Exhibit 3 to her declaration. According to this home page, "PurQi is an organization dedicated to help educate and encourage new research in the areas of spiritual seeking, healing modalities, energy transmissions, transformation, enlightenment, and consciousness. [¶] There are many paths available to pursue when one embarks on the quest to reach his or her full potential. Finding the one that resonates with you as an individual can be one of the most challenging parts of the process. Misinformation and manipulative marketing efforts by some compound the issue, which can influence one's decision making process through the withholding or spinning of facts. [¶] Our mission is to act with grace, love, and compassion and to ensure that the truth is told.

23

"Whenever possible, we will provide scientific data that supports or negates a particular position.  We will also have an interactive opinion area on our Blog, PurReflections, where discussions on particular topics can surface to ensure the flow of information stays current and can be archived.  [¶]  There are very effective coaches, counselors, healers and spiritual advisors who truly care about individuals and have proven track records.  You will find these professionals listed in our library of Best Practices.  [¶] In cases where there is egregious abuse by an individual or an organization, you can click on the **M429** tab to learn more.  We are passionate about protecting the reputations of professional, gifted, and effective individuals and their practices.

"**Current M429 Investigations:**

"**The Trivedi Foundation.  If you are a current or former employee or client seeking information, click here for more information:  TRIVEDI.**

"**Gurus, Brainwashing & Cults Interview**  Click Below to Listen. . . ."    Just below the heading ("**Gurus, Brainwashing & Cult Interview**"), there are two pictures—the first of a man and the second, a woman.  Immediately to the right of these two pictures, the following text appears:  "Interview with Patrick Wanis Ph.D., Behavioral Expert and *Michele Morrisette of PurQi*.  Patrick explains the six basic emotional needs that often, unknowingly influence an individual[']s decision making process as they [sic] seek ways to achieve self-improvement and be better global citizens.  The interview examines the James Arthur Ray case, *Mahendra Trivedi* and Charles Manson as individuals with highly persuasive tendencies that led them on the path to becoming gurus/cult leaders instead of teachers."  (Italics added, bolding and underling in original.)

The "PurQi-Home" page (as identified in the header of Exhibit 3, with the following address identified in the footer:  "http://www.purqi.com/") includes a link to "PurReflections" (as well as a link to "Contact").  Exhibits 4 and 5 to Dean's Declaration are identified as "blog entries," with headers of "Where is the 'Truth' in the Truth in

Advertising?!PurReflections" and "The Power of: Freedom & Free-Will PurReflections" and footers of  https://purqi.wordpress.com/2011/07/05/the-power-of-free-will and http://purqi.wordpress.com/2011/08/27/where-is-the-truth-in-the-truth-in-advertising/. The "PurReflections" blog entries are written in the first person singular but are unsigned.

The first blog post ("The Power of: Freedom & Free-Will", Exhibit 4) is followed by another link to "**Gurus, Brainwashing and Cults, Interview with Patrick Wanis, PhD**" followed by the same picture of a man included on the PurQi home page (Exhibit 3), beside an arrow and the following text:  "**Click Arrow to Listen** [¶] The the [sic] full, unedited version of the audio interview with Patrick Wanis from this past weekend about Gurus, Brainwashing & Cults.  I hope that you will take the time to listen and let his words touch you as they did me.  [¶] For more information visit Patrick at www.patrickwanis.com. . . ."  Eight "RESPONSES" follow the blog entry.

In the second of these responses, "PurQi" thanks "PowerIS Within" who posted the first response and goes on to question "Trivedi's integrity" and how "he likes to 'hook' new followers," saying "he is no Einstein" and "his IQ is rather low.  "PowerIS Within" says (in part) of Trivedi:  "HE IS NOT A GENIUS, HE'S A LIAR & A PLAGIARIZER. . . .  EVEN HIS GURU FAÇADE HAS BEEN DONE MANY TIMES BEFORE. . . ."

Later that night, "Jim Gordon" responds:  "Thank you Patrick . . . I really resonate with the knowledge you shared here.  *Thank you Michele for the work you are doing*." (Italics added.)  "Dennis Lang" says:  "What a fascinating discussion with Dr. Wanis.  As I listen to it I can't help but start to understand what began for me personally as the exploration of one man's practice—that of morality, power and dominance through sexual relations.  The ongoing story of Trivedi includes all of this.  Dr. Wanis begins to inform us where lies our susceptibility to being controlled (and none of us are immune), how people are attracted to it, and how their allegiance is maintained. . . ."  In a subsequent response from PurQi, PurQi says:  "Perhaps Trivedi and his staff should have

25

taken the course that I did at WIPO (Worldwide Intellectual Property Organization—Geneva, Switzerland) before he started copying and pasting!  Works of art and written work products are covered for 70 years after the author dies. . . maybe a few copyright infringement claims would open up a new avenue for people to protest what he is up to."

In the second "PurReflections" blog entry, the author refers to "our favorite guru" and says, "Back in the day when I was working at a Fortune 10 Company, I spent 4 years managing Litigation Prevention and Dispute Resolution. . . ."  The author discusses "My Favorite Consumer Protection Acts," stating "While at Ford I committed the 50 unique Lemon Laws to memory," and "If you promise that a certain type of water will have certain properties but doesn't you have[:] 1) made an implied warranty upon sale and 2) breached the warranty because the product isn't 'fit for the purpose intended.'"  Then, under the heading "**The Consequences of Not Acting**," the author writes:  "When a person chooses not to act on behalf of themselves, not to stand up up [sic] and say[:] 'Hey, you deceived me!' they may unwittingly set in motion a chain of events that can lead to serious injury or even death.  It's not always convenient to act and stand up for something.  Trust me, I know!!  Many people don't want their business reputations to be darkened and will disavow any knowledge or involvement with a certain group if they feel it could harm them professionally.

"Sometimes there are valid reasons.  The injury they suffered was so egregious that it takes a significant amount of recovery time and they are not physically, mentally or emotionally able to stand up and fight for a certain cause.  Others are less valid—my opinion.  The person that has significant inside information and chooses not to be a 'whistle blower' for the purpose of protecting themselves eventually will get caught.  Maybe not in this life by authorities but when the Wheel of Life and Rebirth has turned, they will have to face the cowardly way they acted.  Self-preservation, desire for money and reputation when chosen over doing the right thing, does come back to haunt that person.  Perhaps they feel inhibited by 'confidentiality agreements' but when forced to

26

sign under duress to get a final paycheck or other due monies, the lik[e]lihood of [the agreement(s), sic] being held valid isn't high.

"That is what consumer protection and labor law acts are for. To protect naïve and unwary consumers and employees from a company that is in blatant violation." Again, the seven responses to this blog post specifically refer to Trivedi and the Foundation. "Dennis Lang" again disparages Trivedi's investment of "nothing—zippo—in research to prove his self-proclaimed majesty as the world's greatest healer . . . despite generating revenue in the millions of dollars." "He has told his followers he would invest in research so that in every corner of the globe it would be known that science, real science approved of him. [¶] He lied. [¶] Remember folks, the only study of accepted scientific protocol to be published in the United States was performed by Mr. Trivedi over a number of days on two different occasions in 2009 at Penn State University. That study is linked here at Purqi. The study concluded Trivedi couldn't effect [sic] a thing. His blessings were totally ineffectual. [¶] He has no ability. . . ." "Lang" goes on to discuss the "hyperbolic drivel by a third-rate ad slug that tells you the Trivedi Effect has been seen in 'all kinds of materials and has special applications in hea[l]th and agricultural science.' [¶] Don't believe a word of it. . . ." Later in his response, "Lang" says: "Yesterday I had a conversation with someone once very close to Trivedi. It was his second wife. She wants to warn people she told me. People will seek him out as a last resort for a serious medical matter. They will pay him thousands. Many have. For awhile they may have a renewed hope but that hope will become despair. The blessings don't work. [¶] 'I should know,' she said. 'I was one with a very serious problem. He blessed me and told me I was cured. I wasn't. He lied. And I was his wife.'"

"PurQi" then posted this response: "Wow. Even I am speechless on this one. His second wife or second U.S. wife . . . which would really be third? [¶] Any chance she would be willing to share comments in a main article like Dr. Hegde and Prof. Roy did? I promise it would be very respectful and only for the purpose of providing a place for

27

her to express the warning that she wants to share. . . ." The exchange between "Lang" and "PurQi" continues. Then "Jim Gordon" responds: "Well said both Dennis and PurQi. I must rush and get this comment out on Facebook. Jim[.]"

On this record, we conclude the trial court erred in finding Morrisette's own evidence supported the conclusion the Foundation had a probability of prevailing on its breach of contract claim. In her supporting declaration, Morrisette's attorney (Dean) merely stated that Exhibits 3 through 5 depicted the information set forth on the PurQi Web site at the time she visited that site. The Foundation bore the burden to establish the information on the PurQi Web site was what the Foundation claimed it to be—namely, evidence that Morrisette had violated the nondisparagement provision of the agreement in any way.

Even assuming the evidence can reasonably be read to show Morrisette has some association with PurQi, there is no evidence she made any of the allegedly offending statements or was involved in posting any such statements. (*People v. Beckley, supra,* 185 Cal.App.4th at p. 514 [a "writing may be authenticated by 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is'"]; and see *Wady v. Provident Life & Accident Ins. Co. of America* (C.D.Cal. 2002) 216 F.Supp.2d 1060, 1064, citations omitted [evidence taken from the Internet lacks authentication where proponent does not establish information had been posted by alleged source].) While it is true a plaintiff need only show a case of "minimal merit" (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, quoting *Navellier v. Sletten* (2002) 29 Cal.4th 82, 95, fn. 11), speculation will not suffice. Because the evidence presented does *not* show Morrisette posted any offending comments, her special motion to strike should have been granted.[8]

---

[8]     In light of our conclusion regarding the absence of evidence of Morrisette's alleged breach of the nondisparagement agreement, we need not address Morrisette's further challenges to the trial court's ruling, including her argument the Foundation failed to present any evidence of damages.

## *DISPOSITION*

The order is reversed.  Morrisette is to recover her costs on appeal.


                                                            **WOODS, J.**


**We concur:**



        **PERLUSS, P. J.**




        **ZELON, J.**

29