Filed 5/10/16  Timmerman v. Lambert CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PAUL TIMMERMAN, | B262465 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GC045518) |
| v. | |
| CAROLE ANN LAMBERT, | |
| Defendant and Appellant. | |

_____

APPEAL from a judgment of the Los Angeles Superior Court, C. Edward Simpson, Judge.  Reversed and remanded.

Inglis, Ledbetter, Gower & Warriner, Rhett P. Warriner, Richard S. Gower for Defendant and Appellant.

DeWitt Algorri & Algorri, Ernest P. Algorri, Sam S. Soleimany for Plaintiff and Respondent.

_____

Riding his bicycle shortly before sunrise, plaintiff and respondent Paul Timmerman collided with the right-front portion of defendant and appellant Carole Ann Lambert's car as Lambert was turning left at a residential intersection. In Timmerman's suit for personal injury damages, the trial court granted each party's motion to exclude the testimony of the other's accident reconstruction expert. Lambert appeals from the judgment in Timmerman's favor, contending that the trial court's exclusion of her accident reconstruction expert's testimony was an abuse of discretion. We conclude that the trial court erred in excluding certain portions of the expert opinion evidence proffered by Lambert, and that the error had a likely impact on the jury's verdict. We therefore reverse the judgment.

## Background

Timmerman sued Lambert for damages resulting from injuries he incurred when the bicycle he was riding collided with her car, shortly before dawn on September 30, 2009, in Altadena, California.

**The Accident**

Sunrise on the morning of September 30, 2009, was at 6:47 a.m. Lambert testified that it was still dark as she drove north on Midlothian Drive in a residential neighborhood of Altadena with her headlights on, on the way home from her gym shortly before 6:30 a.m. Activating her car's left turn signal, Lambert turned left onto Meadowbrook Road, cutting the turn short. She believed she was driving going somewhat slower than the posted 25 mile-per-hour speed limit, about 20 miles per hour, as she made the turn.

Lambert saw no southbound vehicle or headlights approaching. When she heard a loud thump on the right side of her car as she turned, she realized she had been in an accident. She stopped her car immediately, and found Timmerman and his bicycle in the road next to the right side of her car. Lambert's car sustained damage to its right front fender, hood, and windshield, rendering it a total loss. Timmerman was seriously injured, and his bicycle sustained major damage.

2

Timmerman testified that he was on a twilight exercise ride that morning, something he did before work a few times a week. His bicycle—a carbon-fiber and aluminum road bike with a $7,000 retail value—had no light and no reflectors. When he left his house about five or 10 minutes before the accident, the sky was not dark, but was "twilight" blue; "there [was] no spectral light coming down and creating hard shadows."[1]

He approached the intersection where the collision occurred going south on Midlothian Road, slightly downhill around a gradual curve to the right. According to the investigating police officer, Timmerman said his approximate speed was 30 miles per hour. He testified that his bicycle's computer device recorded his speed as 22 miles per hour at the time of (or up to three seconds before) the collision.

**Lambert's Accident Reconstruction Expert**

On November 24, 2014, plaintiff's counsel deposed Jon Landerville, an expert designated to testify on Lambert's behalf on issues of accident reconstruction. Landerville had a Bachelor of Science degree in mechanical engineering with a minor in applied mathematics, and a Master of Science degree in mechanical engineering. He is a California registered engineer, accredited by the Commission for Traffic Accident Reconstruction. He had worked in the field of forensic engineering for about 24 years, had been involved in more than 3,000 accident reconstruction projects (including accidents involving automobiles and bicycles), and had testified in hundreds of depositions.

At his deposition Landerville found the bicycle tire abrasions and damage to the bicycle to be consistent with an approach speed of 25 to 30 miles per hour. And he testified that Lambert could not have been traveling faster than about 15 to 17 miles per hour (notwithstanding her testimony that she might have been 20 or more miles per hour), judging from the distance between the point of impact and where Lambert's car stopped.

---

[1] At trial Timmerman testified he left his house at approximately 6:15 a.m.

**Motion In Limine To Exclude Landerville's Testimony, And Evidence Code Section 402 Hearing**

Two days before the trial's scheduled commencement, Timmerman moved in limine to exclude Landerville's testimony and exhibits; or in alternative, seeking a hearing on a motion to exclude the evidence under section 402 of the Evidence Code. The motions argued that Landerville's opinion testimony—regarding the speeds of the bicycle and car, that safe riding required use of a light on Timmerman's bicycle, and that Lambert would have seen him if he had a light on his bicycle—lacked foundation, were contrary to the evidence, and would mislead or confuse the jury; and that his photos, diagrams, and videos lacked foundation and were speculative and irrelevant because they "represent a complete absence of substantial similarity of conditions, times and events."

On the day the trial commenced, the trial court held a section 402 hearing on the admissibility of Landerville's proposed testimony and exhibits. Timmerman's counsel summarized the parties' respective contentions: The plaintiff contends that the case involves a simple left-turn collision during daylight; Lambert contends the collision involved "a conspicuity issue," involving Timmerman's visibility to Lambert, because the collision occurred during nighttime.

According to Timmerman's counsel, his first motion addressed Mr. Landerville's proposed testimony about the speeds of the bicycle and the car, whether the bicycle should have had a light, and whether Timmerman was visible and "conspicuous" to Lambert. His second motion sought exclusion of Landerville's reenactment video (apparently showing the site with an approaching bicyclist). The court indicated at the outset that "if Mr. Landerville falls on any of the items" in the first of these motions, the second motion is moot.

The trial judge viewed Landerville's photographs and stated he had read Landerville's deposition testimony. Landerville proposed to testify that the conditions of the respective vehicles after the collision indicate the bicycle was travelling roughly 18 to 20 miles per hour or slightly faster, perhaps 20 to 22 miles per hour, when it hit Lambert's car; and that its approach speed before braking was somewhat faster, between

25 and 30 miles per hour. Landerville also proposed to testify, based on the investigating police officer's accident-site measurements, that Lambert's car must have been traveling slower than the 20 to 25 miles per hour Lambert had estimated at the time of the accident. And he proffered photographic evidence of the accident site: (1) showing the layout of the intersection and the curvature of the road, with their exposure calibrated to accurately show the degree of light (artificial and natural) on the day of the year and time of the morning shown by other evidence to have been the time of the accident; and (2) showing what Timmerman's approach would have looked like from Lambert's position (based on estimates of the vehicle's speeds) at the time of the accident, both without, and with a light on the bicycle.[2]

After hearing testimony from Landerville and reviewing his deposition, his qualifications, and his exhibits, the court expressed its complete satisfaction with Landerville's background, training and extensive experience in the field of accident reconstruction. Explaining that its ruling should not reflect on Landerville's extensive expertise or experience, however, the trial court precluded Landerville's testimony in its entirety.

With respect to its exclusion of Landerville's opinions about the vehicles' speeds, the court offered a number of explanations: "I don't believe expert testimony on relative speeds are important. The jury is going to hear testimony from the participants as to the speeds that they thought that they were going. The jury is free to accept or reject that testimony."

To the extent Landerville based his testimony about the vehicles' speeds on their conditions after the crash, the court found that "the particular field here of a bicycle colliding with a motor vehicle has not been the major subject of Mr. Landerville's

_____

[2] Landerville and his assistant had taken photographs of the site to reflect the lighting conditions at the time of the accident, and what a driver in Lambert's position could and could not have observed. His photographs were scientifically prepared using a grayscale in order to simulate the lighting with the sun in the same position as it was between 6:24 a.m. and 6:28 a.m. on the date and at the accident's likely times, as shown by the uncertain (and somewhat disputed) evidence.

experience, training or background and a substantial number of his opinions are speculative in these areas and not supported by adequate science."

With respect to Landerville's testimony about the distance at which Lambert could have observed Timmerman's approach (without and with a bicycle light), the court held that "the place where [Lambert's car] came to rest" after the collision provides no foundation from which to determine the car's speed (and from that to compute the distances between the vehicles at various times before the collision). According to the court, that is because the "Jaguar came to rest where the driver chose to stop the vehicle," rather than because it collided with an immovable object.[3]

With respect to exclusion of Landerville's testimony about accident-site lighting at the time and conditions on the morning of the collision, the court explained: "One of the disputed issues in the case is whether or not . . . the defendant observed the plaintiff. I don't believe that that is an issue upon which expert testimony can be used or relied upon. There are so many, many, many variables. It depends upon the light, the time of day, whether the sun was in somebody's eyes, where the driver of the vehicle was looking. Were there any distractions that caused the driver to be distracted. Was the bicycle ridden in the middle of the lane, closer to the curb, on the lane divider on Midlothian. All of those things a jury is going to have to sort out and decide. And I don't believe that expert testimony is relevant or helpful in having the jury make that decision. An expert attempting to testify to those disputed issues has the potential of removing those issues from the jury, that properly belong with the jury."[4]

_____

[3] The transcript reflects the court's statement that the car did not collide with "a removable object," which—although phonetically similar to "immovable object"—would make little sense.

[4] When discussing the relevance of Landerville's testimony on the issue of Lambert's ability to observe Timmerman's approach, and the ability of the jury to determine whether Timmerman was visible to Lambert, the court did not mention Landerville's deposition reference to studies showing that bicyclists believe they can be seen by approaching cars at twice the distance that automobile drivers believe they can see bicyclists.

The court went on to explain that the "simulations, the photographs of an effort to depict the light or ambient light on a day in 2009 based upon a day in 2010 or later is just not reliable." It explained: "There is so much that ambient light depends upon. The visibility depends upon the cloudiness of the sky. The intensity of the sun. You may well be able to identify the position of the sun in the sky, but I don't think we are able to quantify the intensity of the light, any clouds or other shade in the area. It's going to be up to the jury to decide whether or not the plaintiff was or was not visible based upon the testimony of the—of the participants."[5]

After the court ruled that Landerville's evidence would be excluded in its entirety, Lambert's counsel made an oral motion to exclude Timmerman's accident reconstruction expert from testifying. The court granted the oral motion to exclude the photographs taken by Timmerman's expert purporting to show the ambient light and Lambert's field of vision at the time and on the date of the accident, in order to be "consistent" in its rulings.

**Trial and Judgment**

The jury found unanimously that Timmerman suffered substantial damages, and that Lambert's negligence was a substantial factor in causing his harm. The jury also found (10 to 2) that Timmerman was not negligent. Lambert filed a timely appeal from the resulting judgment.[6]

**Discussion**

Lambert argues in this appeal that the trial court abused its discretion by excluding Landerville's evidence and testimony concerning the parties' relative speeds, and Lambert's ability to see Timmerman as Timmerman approached the collision site— before sunrise, at 25-or-more miles per hour without a light. Timmerman argues in

---

[5] The trial court did not address Lambert's objection to the untimeliness of the plaintiffs' motions, having been "served on me on Sunday afternoon before the Monday morning trial . . . ."

[6] Timmerman filed no cross-appeal.

7

response that the trial court acted within its discretion in excluding Landerville's testimony, because his opinions lacked foundation; they were based primarily on speculation, unsupported assumptions, and conjecture; they were contradicted by the testimony of percipient witnesses; and they would have been confusing to the jury.

Evidence Code section 801 provides that the opinion testimony of an expert "is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and (b) Based on matter (including his special knowledge, skill, experience, training, and [¶] education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

## A. Standard of Review

The trial court's decision to admit or exclude evidence, whether upon motion in limine or following an Evidence Code section 402 hearing, is reviewed for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196-197; *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)

## B. The Trial Court Abused Its Discretion By Excluding Landerville's Expert Testimony and Evidence In Its Entirety

### 1. The trial court erred by precluding Landerville's evidence concerning the lighting conditions at the time and place of the accident.

After acknowledging that Lambert's ability to observe Timmerman's approach at the time and place of the accident is a significant disputed issue for the jury's determination, the trial court ruled that it is not a subject "upon which expert testimony can be used or relied upon," because there are "so many, many, many variables."[7] In so

---

[7] The court explained that its exclusion of Landerville's evidence as the vehicles' speeds did not rest on any deficiency in his expertise. "You spent a good deal of your career in this area. My concern is not your experience so much, but what is out there in

8

concluding the court abused its discretion in two respects. First, according to the evidence, most of the variables cited by the court either did not exist at the time and place of the accident, or were amenable to proof by other evidence. It is undoubtedly true that the jury would be called upon "to sort out and decide" variables such as the light and the time of day that the accident occurred; but it is not true that expert testimony on those subjects would be categorically irrelevant, unreliable, or unhelpful to the jury.

The trial court was of course correct that it would be impossible to establish that the lighting conditions when Landerville's photos were taken (on the same day of the year and the same time before sunrise, in successive years after the accident) were precisely identical to those when the accident occurred. But the court erred in concluding that uncertainties would render the photos, and Landerville's testimony about them, so unreliable or confusing as to justify their categorical exclusion.

First, the record dispels the existence or import of most of the variables that concerned the trial court. The parties did not dispute that the collision occurred shortly before sunrise on September 30, 2009, and they stipulated that sunrise was at 6:47 a.m. at the accident site on that date (as reported on the United States Naval Observatory Web site). Nor did they dispute that the sun was in the virtually identical position on the same date and at the same time in each of the years following the accident.[8] Timmerman testified that the morning was dry and the sky was cloudless; no one said otherwise. And almost by definition, before sunrise the sun shines in no one's eyes and casts no shadows. Nor was there evidence of any distractions; Lambert or Timmerman both testified where

the scientific community that one, is necessary for this case, and two, has scientific support."

[8] Timmerman's counsel confirmed this methodology for determining the lighting at the time and date of the accident: "I can represent to the court, from year to year [the position of the sun is the same]. Obviously from time to time, there is a difference. But from year to year, the difference in the degree of the sun angle and whatnot, we have an astronomer here who can probably talk about that, is little, if anything. And doesn't make an appreciable difference. . . . I think we can agree that on the day of the incident, whether it was 2011 when [Landerville's photos] were taken or 2013 when ours was taken, that the angle of the sun would be the same. The times are what matter."

9

they looked as they approached the intersection; and Timmerman testified where in the southbound lane he believed he rode as he proceeded down Midlothian toward the site of the collision.

Although the trial court found that these supposed variables preclude reliable testimony concerning Timmerman's visibility to Lambert during his twilight approach to the accident site, they actually show the opposite. On the evidence before the trial court, the jury could not have concluded that the sun cast shadows at the accident site, or that clouds obscured the sun, or that the sun (or anything else) distracted Lambert or Timmerman. The jurors could make their own determinations about whether the accident occurred during "darkness" as defined by law. (Veh. Code, § 280 ["darkness" is "any time from one-half hour after sunset to one-half hour before sunrise and any other time when visibility is not sufficient to render clearly discernible any person or vehicle on the highway at a distance of 1,000 feet"].)[9] But whether the accident occurred during "darkness" as legally defined would not inform the jury about the actual lighting conditions at the time, date, and place of the accident. The jury had little or nothing to go on to judge whether the light was such that a driver in Lambert's position could have—or should have—seen Timmerman's approach. They therefore had little or nothing to go on to judge whether the conditions were such that Timmerman was legally, or reasonably, required to display a light or reflectors in order to enhance his visibility to oncoming traffic. (E.g., Veh. Code, §§ 21201, 22350.)[10]

---

[9] Timmerman testified that he believed he needed no light on his bicycle the morning of the accident, although he said he left his house at about 6:15 a.m., during the period of legal "darkness" more than one-half hour before dawn.

[10] Vehicle Code section 21201, subdivisions (d)(1) and (e), provide that during darkness, a bicycle or its rider must display a white light visible from a distance of 300 feet in front of the vehicle. Vehicle Code section 22350 provides that "[n]o person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for . . . visibility . . . and in no event at a speed which endangers the safety of persons or property."

10

Yet these were perhaps the trial's central disputed issues. Timmerman's visibility to Lambert at the time of the accident might well have a controlling impact on the jury's determination of the degree (if any) to which Lambert might (or might not) have been negligent in turning left across Timmerman's path; the degree (if any) to which either or both of the parties might (or might not) have been negligent in driving or riding at the speeds they did; the degree (if any) to which Timmerman might (or might not) have been negligent in riding without a light before sunrise; and the degree (if any) to which any such negligence on the part of either (or both) of the parties was a substantial factor in causing the accident.

Moreover, the admissibility of accident reconstruction evidence does not rest on the ability to recreate the circumstances of the accident with exactitude. The conditions on which the expert's analysis rests must simply be "substantially similar" to those of the actual occurrence. (*Pannu v. Land Rover North America, Inc.*, *supra*, 191 Cal.App.4th at p. 1318.) Photographs of the accident scene, although "highly pertinent" evidence (*People v. Turner* (1990) 50 Cal.3d 668, 706) must be made under "substantially similar"—but not necessarily identical—conditions. (*Anello v. Southern Pacific Co.* (1959) 174 Cal.App.2d 317, 323.) "The standard that must be met in determining whether the proponent of the experiment has met the burden of proof of establishing the preliminary fact essential to the admissibility of the experimental evidence is whether the conditions were substantially identical, not absolutely identical." (*Culpepper v. Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521.) Here, although it was impossible to establish that the conditions under which Landerville's photos were taken were identical to those at the time of the accident—on the same date and time but a year or years later—neither is there evidence they were not. (*Andrews v. Barker Brothers Corp.* (1968) 267 Cal.App.2d 530, 537 [similarity of conditions held to be sufficient where no evidence showed dissimilarity].)

Landerville testified in some detail to the scientific basis, documented in literature, for his preparation of his photographs reflecting the site's actual lighting conditions using a grayscale to calibrate the exposure to match the actual lighting conditions at the site

11

over the period of about five minutes during which the evidence showed the accident might have occurred, and showing what Lambert would have been able to perceive with and without a light on Timmerman's bicycle. As with all expert testimony, Landerville's methods and exhibits were subject to cross-examination, impeachment, and critical scrutiny by the jury. But nothing in the record indicates that his methods of calibrating the photographs' lighting to match the actual conditions represented any new innovative, untested, or controversial methodology; and apart from the supposed variables identified by the court, the trial court did not explain—and no reason is apparent—why testimony and photographs prepared in the manner to which Landerville testified could not reliably assist the jury in determining these critical issues. The court's categorical exclusion of this evidence is unsupported, and therefore abused the court's discretion.[11]

## 2. The trial court erred by categorically excluding Landerville's calculation of Lambert's maximum possible speed.

The speeds of Lambert's and Timmerman's approach toward their collision site might have been of significance at trial, for a number of reasons. Among other possibilities, for example, the juror's conclusions about the parties' speeds might affect evaluations of the vehicle's distance apart and their visibility to one another leading up to the collision; and it might affect the juror's determinations whether either or both vehicles were traveling faster than the posted 25 mile-per-hour speed limit, or faster than was safe under the existing lighting conditions—issues relevant to their possible negligence and causation of the collision. (Veh. Code, § 22350.)

Lambert has not argued in this appeal that the trial court lacked justification for its exclusion of Landerville's opinions about the bicycle's speed before and at the time of the collision. Landerville had testified he drew his conclusions on those subjects from photographs of the damage to the bicycle and the car, and from the bicycle's tire showing severe wear from a major skid, as well as from the police report. But the court concluded

_____

[11] The admissibility of any expert testimony or opinions offered by the parties in any future proceedings in this case is not before us, and we express no opinion on those subjects.

12

that Landerville had not conducted the sorts of testing and examination that could provide a foundation for his testimony on this issue. Landerville confirmed he had not evaluated automobile-bicycle collisions involving bicycles of the same make, model, or precise materials as those in Timmerman's $7,000 carbon-fiber and aluminum bicycle. And he supplied no basis for his claimed ability to judge Timmerman's speed from the bicycle tire's wear during its skid as it approached Lambert's car.

Nor has Lambert argued that the court abused its discretion by ruling that the jury would not be aided, and might be confused, by Landerville's opinions about the time of the collision, based on the extent of likely delays in contacting and routing the emergency response between the time of the 911 call and the officers' arrival at the accident scene.[12] Because these aspects of Landerville's testimony are not raised by Lambert's appeal, we have no reason to fault the court's exclusion of the portions of Landerville's testimony that rest on these grounds.

Landerville's excluded testimony and evidence involved at least two additional issues, however. The trial court's exclusion of Landerville's evidence in its entirety excluded not only his opinions about the speed of Timmerman's bicycle, but also his opinions about Lambert's speed approaching the collision site, and his photographic evidence about the pre-dawn lighting conditions at the accident site during the period the evidence showed the accident occurred.[13]

Landerville testified that Lambert's maximum possible speed at the time of the collision could be determined by calculation, based on the distance between the point of impact with Timmerman's bicycle and the place the car stopped following the collision.

---

[12] Lambert presumably would argue that the earlier the accident occurred, the darker it was and the less-visible Timmerman would be approaching the accident site without a light. As the trial court noted, the jury would have to decide whether a bicycle light would have been helpful in making Timmerman visible at that time of the day.

[13] Also excluded were Landerville's testimony and evidence about the impact that a standard bicycle light would have had on the visibility of Timmerman's bicycle to an approaching car, at the distances and lighting conditions shown by the evidence—issues that Lambert's appeal does not specifically address.

He testified that Lambert's car could not have been traveling as fast as the estimate shown by some other evidence: "[I]f we look at the point of impact, it's documented by the officers on-scene. And the point of rest of the car. The car cannot be going 25 miles per hour at that impact point, because it will never stop in time if you do the calculation per perception and reaction and braking distance." According to Landerville, if Lambert's car had been traveling at 25 miles per hour, it could not have stopped in less than 100 feet—far more than the 32 feet measured by the investigating officers after the accident. To stop in 32 feet, he computed, the car must have been traveling far slower— perhaps 15 to 17 miles per hour, at most. And from evidence that Lambert's car was traveling more slowly than otherwise indicated, jurors might conclude (among other possibilities) that the vehicles were further apart, and that Timmerman's approach was thus less visible to Lambert, when Lambert began her left turn across Timmerman's path.

The trial court did not agree with Timmerman's counsel that the parties' speeds were of no importance—that the issue was only Lambert's inattention, not the parties' speeds. The court ruled instead that no reliable calculation of the speed of Lambert's car could be made based on the distance between the point of collision and where her car stopped. "I don't think it's particularly reliable to use the place where the Jaguar came to rest as a foundation for scientific analysis," because the "Jaguar came to rest where the driver chose to stop the vehicle," not as a result of the collision.

But according to Landerville—whose expert credentials the court confirmed—the court's reasoning ignored the undeniable fact that the distance in which a car can be stopped is affected by its speed; if it is going faster, it cannot be stopped in as short a distance as if it is going slower. But the court held to the contrary, that the distance it took for Lambert to stop her car after the impact (shown by the investigating officer's measurements to be 32 feet) was totally voluntary on her part: "It could have been 42 feet or 52 or 12," the court concluded. But according to Landerville, the court did not understand the import of his calculations. "That's the point," he tried to explain; "the brakes can't stop the car at 12 feet" if it were going 25 miles per hour; at that speed its

14

stopping distance would be 100 feet, when the driver's perception and reaction time are taken into account.

We are instructed by *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*), that "under Evidence Code section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion." It was thus the trial court's job to determine whether the matter relied upon by Landerville was "*of a type* that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (*Id.* at p. 769.) Did the police report's measurements, scientific literature concerning driver perception and reaction times, and mathematical calculations of automobile stopping distances based on speed and mass, provide reasonable grounds for a qualified expert accident reconstruction engineer to conclude that Lambert could not have stopped her car within 32 feet of the collision if she had been traveling 25 miles per hour? Or to the contrary, was Landerville's opinion on that point based on speculation, conjecture, or propositions yet untested by scientific evidence? (*Id.* at p. 770.)

Although the trial court must exclude expert opinion testimony that is speculative or based on matter or reasons that are unsupported by the material on which the expert legitimately relies (*Sargon*, *supra*, at p. 772), "the gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" (*Ibid.*) And although the trial court has broad discretion to make that determination, its discretion is not unlimited. "The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown." (*Id*. at p. 773.)[14]

---

[14] "The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion.

15

The admonition that the trial court must exclude expert opinion testimony that is speculative, or based on matter or reasons that are unsupported by the material on which the expert legitimately relies, does not apply to Landerville's opinion of Lambert's maximum possible speed. Timmerman's counsel would be free to argue to the jury, and the jury would be free to conclude (as apparently did the trial judge), that Landerville's opinion about the maximum possible speed of Lambert's car should be distrusted and rejected. But in this case the record lacks any evidence or indication that Landerville's opinion about the maximum possible speed of Lambert's car was categorically speculative, or that it was based on matter of a type on which an expert may not rely, or on reasons that are unsupported by the material on which he relied in reaching his conclusion.

Nor was the trial court's articulated basis for the opinion's exclusion reasonable, for it failed to account for the underlying logic: A driver can stop an automobile in no shorter distance than is shown to be scientifically and mathematically possible with respect to the automobile's speed and characteristics; therefore the shorter the automobile's stopping distance, the slower the automobile's speed. The trial court's ruling that the automobile's maximum possible speed cannot be determined by a qualified expert with sufficient reliability to assist the jury, based on the distance it took to stop the car, therefore lacks any basis in the record. As the Supreme Court noted in *Sargon*, the "issue before us is whether the court abused its discretion in excluding the expert testimony" based on its conclusion that the opinion "was not '[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion

---

Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.' [Citation.] The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion." (*Sargon*, *supra*, at p. 772.)

16

upon the subject to which his testimony relates . . . .'" (*Sargon*, *supra*, 55 Cal.4th at pp. 775-776.)[15]

It was up to the jurors to decide whether they believed that Lambert's speed was important to their decision, and if so, what speed they believed she was traveling. Despite the trial court's contrary conclusion, there can be no doubt that any determination of that disputed fact might be informed by Landerville's conclusion (if credited), that Lambert must have been going 15 to 17 miles per hour rather than the 25 miles per hour indicated by other evidence, because otherwise her car could not possibly have stopped where it did. It is not contended that Landerville's computations and opinion about Lambert's speed would be within the common knowledge or experience of jurors. (*New v. Consolidated Rock Products Co.* (1985) 171 Cal.App.3d 681, 692 [for an expert witness' opinion testimony to be admissible under section 801, it must relate to a subject beyond common experience such that the expert's opinion would assist the jury].) In the absence of any basis in the record for its exclusion, Landerville's opinion on that subject was evidence that the jury might have found helpful, and that Lambert was entitled to present. Its exclusion therefore abused the trial court's discretion.

## C. The Exclusion of Landerville's Evidence Was Prejudicial

"The trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice'—that is, that a different result would have been probable if the error had not occurred." (*Zhou v.*

---

[15] Timmerman argues that the court's exclusion of Landerville's opinion about Lambert's speed was justified because it relied on "indeterminate 'approximate' distances, because the collision report was 'not to scale.'" But that misunderstands the term "not to scale," which means only that the report's accident-site drawings may not accurately match its measurements. And although the form recites on each page that its measurements are "approximate," it reports the "approximate" stopping position of each of the car's four wheels to the nearest foot, as measured by the investigating officer using a "Rollameter" wheel—just as were the measurements relied upon by experts in other accident cases (e.g., *Pannu v. Land Rover*, *supra*, 191 Cal.App.4th at p. 1304). This record could not justify a categorical exclusion of any computations based on these measurements, even if the trial court had accepted such a contention.

*Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480; *Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1013; Cal. Const., art. VI, § 13; Evid. Code, § 354; Code Civ. Proc., § 475.)

The excluded evidence was intended to better enable the jury to evaluate whether either or both of the parties were negligent in approaching the site at speeds that either exceeded the posted speed limit or were otherwise unreasonable under the circumstances; in failing to display lighting that was legally or reasonably required under the circumstances; or in failing to earlier observe the other, either for those or other reasons. Without it, the jury had only Lambert's testimony that it was still quite dark at the time of the accident, and she could not see Timmerman's approach; and Timmerman's testimony that he believed it was already quite light.

The jurors were unanimous in finding that Lambert was negligent in turning left across Timmerman's path; we cannot say that a different conclusion would have been reasonably probable if Landerville had been permitted to testify.

However only 10 jurors found that Timmerman was not negligent in approaching the accident site at the speed he did, without a light, and wearing the clothing he wore, under the conditions at the time of the accident. If the jury had heard and seen evidence from which it could evaluate the parties' recollections and credibility concerning the lighting and visibility at the accident site, and the distance at which Lambert could reasonably be expected to see Timmerman's approach, it seems reasonably probable that two or more jurors might have concluded that Timmerman was negligent to some degree, and that his negligence was a substantial factor resulting in his harm.

**Conclusion**

The trial court abused its discretion by excluding Landerville's expert testimony in its entirety, and particularly with respect to the issues identified above. Because it appears reasonably probable that these errors affected the verdict and judgment, reversal is required.

**Disposition**

The judgment is reversed. The matter is remanded for appropriate pretrial evaluation and determination of questions regarding admissibility of either party's expert opinion testimony in accord with this opinion.

Appellant to recover her costs on appeal.

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:


ROTHSCHILD, P. J.


JOHNSON, J.